UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

IN RE:                        .    Case No. 10-12431(REL)
                              .
                              .
JOHN C. SZUMOWSKI,            .    James T. Foley Courthouse
                              .    445 Broadway
                              .    Albany, NY 12207
        Debtor.              .
                              .    January 13, 2011
. . . . . . . . . . . . ..         11:09 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE ROBERT E. LITTLEFIELD
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE


APPEARANCES:

For the Debtor:          Law Offices of Ronald Kim
                         By:  RONALD KIM, ESQ.
                         2484 Ridge Road
                         Schenectady, NY 12302

For the U.S. Trustee:    Office of the United States Trustee
                         By:  LISA PENPRAZE, ESQ.
                         74 Chapel Street
                         Albany, NY 12207




Audio Operator:          Vicki Griffin



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail: jjcourt@jjcourt.com

(609)586-2311      Fax No. (609)587-3599

2

APPEARANCES (Cont'd):

| | |
|---|---|
| For BAC Home Loans/<br>Countrywide: | Steven J. Baum, P.C.<br>By:  NATALIE GRIGG, ESQ.<br>220 Norhpoint Parkway, Suite G<br>Amherst, NY 14228 |
| For Steven J. Baum,<br>P.C.: | Connors & Vilardo, LLP<br>By:  VINCENT E. DOYLE, III<br>1000 Liberty Building<br>424 Main Street<br>Buffalo, NY 14202 |
| For GMAC and Deutsche<br>Bank: | Hinshaw & Culbertson LLP<br>By:  SCHUYLER B. KRAUSS, ESQ.<br>780 Third Avenue<br>4th Floor<br>New York, NY 10017 |
| For Chapter 13 Trustee: | Deily, Mooney & Glastetter, LLP<br>By:  BONNIE S. BAKER, ESQ.<br>8 Thurlow Terrace<br>Albany, NY 12203 |

1          COURT CLERK:  We're going to call the two matters

2 from Page 26, John Szumowski, 10-12431, and this is an

3 objection to claim, and George Bevins, 10-12856, and this is

4 also an objection to claim.  Can the parties note their

5 appearances for the record?

6          MS. BAKER:  Bonnie Baker on behalf of the Chapter 13

7 trustee.

8          MS. PENPRAZE:  Lisa Penpraze, Office of the United

9 States Trustee.

10          MS. GRIGG:  Natalie Grigg of Steven J. Baum on behalf

11 of BAC Home Loan Servicing.

12          MR. KRAUSS:  Schuyler Krauss, Hinshaw & Culbertson on

13 behalf of GMAC and Deutsche Bank in the Bevins matter, Your

14 Honor.  Good morning.

15          THE COURT:  Good morning.

16          MR. DOYLE:  Vincent Doyle on behalf of Steven J.

17 Baum, P.C., Your Honor.

18          MR. KIM:  Ronald Kim on behalf of the debtors.

19          THE COURT:  Ms. Baker, do you take a position on

20 either of these?

21          MS. BAKER:  We're an interested party, certainly, in

22 the issues that have been raised by the Office of the United

23 States Trustee.

24          THE COURT:  Mr. Kim, let me see if I, in the larger

25 picture, you have problems -- common problems with both in

4

1  that, number one, you're saying as a matter of law they have no

2  standing?

3          MR. KIM:  Yes, Your Honor.

4          THE COURT:  And also, as a matter of law, they have a

5  conflict?

6          MR. KIM:  Yes, Your Honor.

7          THE COURT:  So that under either end or both the

8  creditor has big trouble here because of either the lack of

9  standing or the conflict, and, in fact, you're asking for

10  sanctions from --

11          MR. KIM:  Yes, Your Honor, on the conflict of

12  interest -- let me put it this way, Your Honor.  I believe as

13  an attorney it's my duty to point out these issues to the

14  Court.  It is certainly your power in a 105 to assess those

15  issues, but clearly, just taking the issue of these

16  assignments, clearly the attorneys for these two creditors did

17  not disclose the fact that the individual -- and I cannot

18  pronounce her name, so I'm going to call her Ms. B. -- Ms. B.

19  did not -- that she was signing these assignments, did not

20  disclose the fact that she in effect was an employee of the

21  Steven J. Baum's office.

22          THE COURT:  Aren't there common allegations in both

23  cases?  In effect we have two different cases, but in effect

24  the arguments are the same in both, are they not?  I mean we're

25  dealing with similar -- the same issues in both cases.

1  Different underlying facts, but remarkably similar in terms of

2  the legal sufficiency.

3          MR. KIM:  Yes, Your Honor, except in the Bevins

4  matter.  And I was just served with the opposition.  There have

5  -- some issues have come to light in that service because of a

6  prior deposition of Judy Faber that I'd also like to bring to

7  the Court.  I certainly will file a reply in that matter with

8  the requisite documents, but in effect Bevins -- the attorneys

9  for -- in the Bevins matter have come forward with an affidavit

10 to substantiate essentially that they owned the note.

11         Now, there's a real question if you compare the notes

12 of -- that were submitted in the foreclosure and in the proof

13 of claim they changed to the one that now is appearing in the

14 brief that is opposing this.  The other thing about Judy Faber

15 -- and I'd be happy to provide you with the actual deposition

16 transcript -- in several places she says that she didn't know

17 what she was signing.  In several places in the deposition that

18 was in Marion County Superior Court in Indiana in 2008 -- I'm

19 sorry, 2009 -- she also admits that in effect this endorsement,

20 which is the critical -- the crux of their substantiation that

21 they now hold the note, it's a stamp.  That in effect this is

22 -- not only is it a stamp as we -- we all have notary stamps,

23 but the actual signature is a stamp.  That's admitted in the

24 deposition.

25         THE COURT:  Let me ask you this, Mr. Kim.  If I

1 understand both situations you don't contest the underlying

2 transaction in the sense that both clients received the money

3 and a mortgage was given and a mortgage is out there somewhere

4 by somebody and your client owes money to somebody?  You're

5 just saying you don't owe money to these people?

6 MR. KIM:  Yes, Your Honor.  And I've sat in this

7 court a number of years, and we've all wrestled with, you know,

8 motions to lift stay where creditors come in and saying you owe

9 X and debtors saying you -- I don't owe any money.  And I think

10 that's -- so we've all had experience with that and that's why

11 we're seeing why that is -- has occurred on and on again in

12 this court.

13 THE COURT:  Well, let's deal with Mr. -- is it

14 Szumowski?

15 MR. KIM:  Yes, Your Honor.

16 THE COURT:  You're the first.  There is a closing, as

17 I recall, that involves Home Funding Finders.  Your client

18 signs a mortgage, Home Funding -- well, no.  The mortgage is --

19 MR. KIM:  HFF, yes.

20 THE COURT:  HFF, but MERS is involved.  MERS is the

21 nominee on the mortgage.  The note was to HFF, but then at the

22 end of the note it's endorsed in blank I guess right at the

23 closing.

24 MR. KIM:  Well, we don't know that, Your Honor, and

25 that's one of the issues that certainly cries out at minimum

1  for discovery, but I -- or some factual finding about that.  We

2  don't know that, Your Honor.

3      THE COURT:  Well, let me ask you this, Mr. Kim.  Does

4  it matter when it was endorsed in blank?  If HFF wants to

5  endorse it in blank it's kind of like a check and they do so at

6  their peril and they want to throw it out the window, whoever

7  picks it up, I guess, has the note.  I would assume that

8  somewhere after -- either at the closing or thereafter, there's

9  some deal.  HFF is going to give it to whomever -- I think that

10 was Countrywide and ultimately is BAC, or BA -- as a routine

11 commercial transaction so that it ends up in the hands of Bank

12 of America or their mortgage arm, whoever it is -- it ends up

13 with Bank of America.

14      MR. KIM:  Well, Your Honor --

15      THE COURT:  And you're saying there's a problem with

16 that.

17      MR. KIM:  Well, I think there is because if it's

18 bearer paper, you're right, Your Honor.  The bearer will

19 basically be able to foreclose.  Now, the logical extension of

20 that, Your Honor, is these documents -- the banks apparently

21 are having so much trouble keeping them that the logical

22 extension of that is, you know, if we take that do we basically

23 have a robber who can essentially -- you know, who stole and

24 he's foreclosed.

25      But, setting that aside, the other issue is, in their

1  own briefs, both briefs that oppose our motion -- objection --

2  they're saying that essentially you split the note, you split

3  the mortgage, it's a nullity.  That's -- there's strong case

4  law, Court of Appeals here in the state.  So, it does matter.

5          THE COURT:  That's one of the questions.

6          MR. KIM:  So, if there's bearer paper that

7  essentially in the Szumowski case is what they're purporting

8  -- in the other one they are purporting that there was a --

9          THE COURT:  Who's BAC here?  You're BAC?

10          MS. GRIGG:  I am, Your Honor, yes.

11          THE COURT:  You have an affidavit from a lady that is

12  buried somewhere in Bank of America that analyzed all of this

13  and came to the conclusion that Bank of America has the

14  original note.  Does that mean you can produce the original

15  note?

16          MS. GRIGG:  Yes, Your Honor.  And, in fact, we have

17  been discussing with the U.S. Trustee --

18          THE COURT:  Okay.

19          MS. GRIGG:  -- that we will be producing the original

20  note.

21          THE COURT:  So, that actually does exist --

22          MS. GRIGG:  Yes.

23          THE COURT:  -- and can be produced and we will

24  actually see that?

25          MS. GRIGG:  Yes, Your Honor.

1          THE COURT:  Okay.  Mr. Kim, what if they actually

2    produce that note?  Are you saying that -- if I understand this

3    side of the argument it's that this is no big deal, it's done

4    all the time, that there doesn't have to -- it doesn't have to

5    be a writing, it doesn't have to be signed.  Mere delivery, if

6    they have the note then they have all the legal accouterments

7    that go with that note.  They have the ability to foreclose.

8    You disagree with that?

9          MR. KIM:  Your Honor, if the note has then been

10   handled and transferred and negotiated in a manner that's

11   consistent with the underlying pooling and servicing agreement

12   then they don't have a problem, and that's at the crux of this,

13   is whether or not that has actually been done.

14         THE COURT:  What were they supposed to do that you

15   think they may not have done?

16         MR. KIM:  Well, Your Honor, that's part of the --

17   that would lead to -- I -- that's an issue of discovery.

18   That's an issue that goes beyond what I --

19         THE COURT:  Give me an example.  What could they have

20   done that may have been verboten that gets them into hot water

21   legally here regarding the handling of the note or the passing

22   of the note from one -- what could they have done that they

23   shouldn't have done?

24         MR. KIM:  Well, Your Honor, one issue would be if the

25   transfer of those notes occurred after the filing of the

1  bankruptcy I think a question is raised as to whether or not

2  they had to get a motion of lift stay to actually do that.

3  That's just one issue.  The pooling and servicing agreements,

4  one is attached to the Bevins motion, just the -- just

5  essentially the summary, if you will, is about 100 pages, but

6  there are very specific rules and regulations in there that

7  deal with the tax implications of those trusts as to how they

8  -- ultimately they're the holders of the notes -- purported to

9  be.  That's what Bevins essentially bases their entire defense

10 on.  If they haven't handled it appropriately then that can be

11 that -- if that's inconsistent that can be an issue.

12        THE COURT:  What happens, Mr. Kim, if you -- you're

13 looking to ultimately prevail and expunge their note and

14 mortgage.  Isn't that what you're --

15        MR. KIM:  No, Your -- at this point, Your Honor, what

16 I'm looking for is limited to expunging the proof of claim.  I

17 certainly want to join with the U.S. Trustee's Office to see

18 the original notes.  There may be -- notes and mortgages.

19 There may be also discovery that is appropriate under 2004 for

20 this.

21        THE COURT:  But let me ask you this.  What good does

22 it do your client if you get the proof of claim expunged?  They

23 still have a valid real property lien out there somewhere

24 that's getting further into default unless they're paying.

25 Does that make any sense?  I mean, that sounds like the classic

1  pure victory, that you get that expunged, but then you set your

2  client up for a foreclosure by somebody sometime.

3         MR. KIM:  Well, Your Honor, I'd ask you to look at it

4  the other way.  And this is an emerging problem in the mortgage

5  modifications and title insurance.  My clients are at risk.

6  Someday in the future they're not going to be in bankruptcy.

7  We all hope that.  That's why we're here.  Someday in the

8  future they're going to want to sell their home.  And if a

9  title company comes by -- and we know that title companies are

10 perhaps the most conservative creatures alive -- and they're

11 concerned about who owned this note and whether payments were

12 made, et cetera, that is, I believe, an issue that goes to the

13 very core of why it's important to get this sorted out now.

14        THE COURT:  So, are you saying that, forget the

15 bankruptcy, that the way all of the creditors acted your client

16 merrily goes along his way and in ten years goes to sell the

17 property, refi the property, whatever, a title company is going

18 to say -- make the same arguments you're making here that

19 somehow they didn't properly process the note or pass the note

20 and that there's a cloud on the title because of just the way

21 the banks have interacted among themselves?  Is that what

22 you're saying?

23        MR. KIM:  Your Honor, that's been widely discussed

24 even in the popular press lately that title companies are

25 concerned about that issue as to these -- they've called them

1  foreclosure irregularities.  I believe that, particularly based

2  on the Faber deposition this is actually fraud and that's why I

3  brought this to Your Honor's attention.

4         THE COURT:  You think the fraud because of Ms. B. or

5  the fraud because of the way the note was transferred or --

6         MR. KIM:  Your Honor, there's layers of it.  Again, I

7  would just point out that we have a note that was -- in the

8  Bevins matter, a note that appears in the foreclosure -- I can

9  provide you with those papers -- appears in the proof of claim

10 to not have any endorsements.  Suddenly it has the appropriate

11 endorsements.  We don't know when.

12        We have -- as referred to earlier we have a

13 deposition of a Judy Faber who is in this case, so it's

14 relevant.  She is essentially substantiating the argument of --

15 in the Bevins matter who essentially says not only did I stamp

16 -- didn't I -- did I provide a stamp to people to stamp these

17 documents, but I didn't even know what I was -- I wasn't even

18 familiar with one affidavit that's very similar.  I can

19 certainly read you the excerpts.  I have copies here.  But, the

20 point is is that we can manufacture all we want.  The question

21 is if that's what this Court demands in terms of determining

22 these issues.

23        THE COURT:  Let me ask you this.  Wouldn't a lot --

24 and your client I can understand is concerned.  They want to

25 have a -- they want to know who they're paying and they want to

1    have an accurate title so that someday there won't be issues at

2    a closing or a refinancing, whatever it is, that they can get

3    all that done.  A lot of your arguments, shouldn't they be made

4    by the individual banks and lenders that are in the chain in

5    the sense that you're saying fraud and there's some question as

6    to whether somebody endorsed this correctly or had a magic

7    stamp that just -- that they were just wielding unnecessarily

8    or whatever it is, wouldn't that be for the various banks in

9    the chain of title to be raising?  You just want to know who

10   you're paying.  You agree that you owe money to somebody.  You

11   want to pay the right person, and when you pay that person you

12   want it done accurately and you want a release of lien some

13   day.  Isn't that --

14            MR. KIM:  And, Your Honor, the standing -- I think

15   you're reflecting this argument about the standing issue.  It's

16   sort of interesting that now the sword is -- the sword that

17   defendants have used and debtors have used is now being used by

18   the plaintiff creditors.  But, the standing issue to me, Your

19   Honor, it's very clear that my clients have an interest in

20   this.  Again, someday they're not going to be in a bankruptcy

21   court.  Someday they're going to need to sell this property and

22   to have the assurance that the monies that they have, in fact,

23   paid are to an entity that actually has the right to receive

24   that.  And, Your Honor, we can even go further is -- the

25   fundamental issue I present to the Court here is essentially

1  the issue of whether or not they even belong here.

2           THE COURT:  Who belongs here?

3           MR. KIM:  The creditors.  If the creditor doesn't

4  have standing to file have standing to file the proof of claim

5  isn't that a fundamental issue of this bankruptcy court as to

6  whether or not that creditor gets the right to get money from

7  Ms. Selley (phonetic)?

8           THE COURT:  Well, you're absolutely right.  Parties

9  need standing.  But, to me in a Chapter 13 many times that's

10 more -- it's almost sometimes an academic question.  I'm almost

11 more -- I think I'm more concerned with do they have a valid

12 underlying substantive claim to take the money.  If you're not

13 challenging the validity of the underlying loan transaction,

14 you owe the money to somebody, you want to make sure it gets to

15 the right person.

16          And to some extent standing is a very interesting

17 issue, but in the real world practicalities of a Chapter 13

18 where we're trying to save homes, sometimes that deflects us

19 from some of the real issues at bay.  But, let me -- Ms.

20 Penpraze, you have -- when we're looking at this standing

21 issue, do you agree that the parties -- that there's some

22 inherent problem with the way the note was transferred or the

23 way the note has delineated such that they had no ability in

24 state court to bring the foreclosure action?

25          MS. PENPRAZE:  I think that would be, Your Honor,

1  beyond what the U.S. Trustee's interest is in this -- in these

2  two matters and going forward.  If I could, basically there --

3  my understanding is there's two ways to transfer an interest in

4  a promissory note, because that's the operative document at

5  this point, is the note.  So, either it's transferred by

6  assignment or they physically transfer it to the next party.

7          THE COURT:  By delivery.

8          MS. PENPRAZE:  So, I think what -- from my position,

9  when we look at the proof of claim or the lift stay or whatever

10  it is, the creditor has to tell us how you believe you're a

11  creditor.  Either you have the note -- you have possession of

12  the original note, or you've received an assignment.  I think

13  the problem is there's been a lack of clarity.  There's been,

14  you know, using the term mortgage and the term note

15  interchangeably, and they're absolutely not interchangeable.

16          THE COURT:  Separate and distinct, absolutely.

17          MS. PENPRAZE:  So, I am endeavoring now since we

18  received the responsive papers, it seems like both creditors

19  are saying, yes, we have the original note, and that's how we

20  establish that we're a creditor.  So, my goal today is to get

21  those and we have agreement to get those and we're going to

22  look at those next week.

23          THE COURT:  And, frankly, I would like -- I have the

24  same interest that -- who has the -- do you have the original

25  note, and if you do, you do.  Let's put that aside and let me

1   ask the creditors if I understand this Ms. B. situation.  Ms.

2   B. is a lawyer for the Baum firm, wears a hat.  She's an

3   attorney admitted to -- partner or associate, whatever, she's a

4   member of the firm.  At the same time she's an independent

5   contractor.  She's some -- has some relationship with MERS so

6   that she can sign documents, but she can sign those documents

7   whether or not it would be considered a classic conflict for a

8   member of the Baum firm to do that.  She certainly couldn't be

9   a lawyer for Baum and sign documents for one side of the

10  transaction and then have another member of the Baum firm

11  represent the other part of the transaction.  Would you agree

12  with -- you can't represent both sides of anything, of a

13  divorce, of a commercial transaction unless -- unless you have

14  the written, informed consent of both creditors.

15          Now, my question, do you have written, informed

16  consent?  I'm sure there's some kind of form or language

17  drafting that somebody has out there.  Do you have that

18  somewhere in your file from both of these entities?

19          MR. DOYLE:  Your Honor, if I could address that as

20  counsel to the Baum firm on these matters.  The short answer to

21  your question I believe is no, but let me explain that if I

22  might.  The requirement of written consent to a conflict is a

23  relatively within the last year new development for the New

24  York Code of Professional Conduct.  And last year I believe at

25  the latter part of 2009 the New York ethical rules were

amended.  We moved from what used to be a disciplinary rule

system, the DR system, to a system of the model code based on

the model code where rules are used.  That was an insertion

into the new rules that any conflict waiver essentially --

there's some exceptions -- that any conflict waiver be in

writing.  Before that time it was not required to be in

writing.  It was simply that there had to be a waiver by both

sides.  That's point number one.

THE COURT:  So, do you have the waiver by both sides?

MR. DOYLE:  We do -- we believe we do have a waiver.

THE COURT:  You believe you have the waiver?

MR. DOYLE:  Yes.  Yes, we believe --

THE COURT:  Well, it seems that you either have it or you don't.

MR. DOYLE:  Well, we do, Your Honor, but your asking if I have it implies a physical document.  We don't have a physical document.  There was a waiver by both sides.  Both sides and the Baum firm entered into a signing agreement that specifically gave certain lawyers at the Baum firm, including Ms. Bechakas -- that's how you pronounce her name -- the authority to sign on behalf of MERS these assignments at the request of the -- in this case, BAC.  So, by signing -- by all three parties signing that agreement they waived any conflict that existed.

Now, if I could take a further step back, Your Honor.

1  We don't believe, in fact, there is a conflict, and the reason

2  for that is we don't believe that by signing that document Ms.

3  Bechakas was representing MERS in a legal sense.  She was doing

4  something on their behalf, but she wasn't rendering a legal

5  service.  Every time a lawyer does something doesn't mean

6  they're rendering a legal service.  There's a lot of things a

7  lawyer can do that don't necessarily mean they are representing

8  the person.  In this case she simply had signing authority that

9  the parties, MERS, and in this case BAC, and a number of other

10  servicers had entered into this agreement as a convenience to

11  help speed along the paperwork process.

12          Now, it's been called into question within the last

13  six months to a year by various state courts whether that was

14  appropriate to do so or not.  I can tell you that it's no

15  longer being done in light of the issues that have been raised

16  by various state courts.  It's no longer being done.  Ms.

17  Bechakas and others are not signing on behalf of MERS.  But it

18  was done for a period of time and no one was raising an issue

19  about it.  And this particular one was signed back in 2008 and

20  there really wasn't an issue that anyone was raising any doubts

21  about.  But again, we don't believe that the signature was

22  actually representing MERS, so there wasn't a conflicting

23  representation.  We also don't believe that the interests of

24  MERS and BAC conflicted.  Both parties wanted to have this

25  arrangement where assignments could be done easily once --

1          THE COURT:  But, a lot of times both husband and wife

2    want to get a divorce and they just want to go to one lawyer,

3    they don't want to incur the expense, they don't want to incur

4    the hassle, so they go to a lawyer and say, you know, we're

5    fine and we're aligned in our interests and we just want you to

6    do it.  Isn't there some obligation for the lawyer involved to

7    step back and say there at the very least may be the appearance

8    of an impropriety here, that somebody else is going to look at

9    this and see that I'm a member of this firm and that I'm

10   signing my name on behalf of one party to this transaction, my

11   firm represents the other side of this transaction?  That just

12   reeks of -- if nothing else of the appearance of an

13   impropriety.

14          Aren't -- shouldn't -- and the Baum firm, of all the

15   experts involved in all this, why wouldn't they be held to a

16   higher standard that you simply can't do this.  It looks awful.

17   It looks awful.  It looked awful then, it looks awful now, that

18   simply no basis -- and at some point, yes, everything may be

19   hunky dory and everyone gets along and they're all singing

20   Kumbaya, but that's not the standard.  The standard is for a

21   lawyer, an attorney represented to the bar, to take one step

22   back and say, yes, maybe this one may be okay, but this is

23   going to lead to something else and something else and

24   something else and there's a reason why we have DRs and why we

25   have rules of professional responsibility and why attorneys are

1  held to the standard where you simply don't get involved with

2  friendly transaction among everybody that seems to be getting

3  along, and that's great until something blows up -- until

4  something blows up.

5        MR. DOYLE:  I don't disagree with what you said, Your

6  Honor.  Obviously at the time back in 2008 it didn't seem to

7  the Baum firm that anything was wrong about that.  And I can

8  represent to Your Honor that --

9        THE COURT:  But, isn't that the first problem?  Maybe

10  the Baum firm should've gone to somebody else and said, gee,

11  we're thinking about getting involved in this kind of unusual,

12  unorthodox transaction where a member of our firm is going to

13  be an independent contractor and sign papers, but we're going

14  to represent the other side, and do you see a problem with

15  that?  Isn't there something wrong with that?  It kind of makes

16  me squirm.  Do you agree?  Can I do that?

17        Somebody just went full steam ahead for whatever

18  reason, and I assume it's because they were involved with the

19  mortgage business.  It meant business to them.  It was easier

20  to do it that way.  And for the sake of expediency somebody

21  didn't think about the ethical issues involved in that.

22        MR. DOYLE:  Well, Your Honor, I can tell you that

23  beginning in 2009 the Baum firm did consult with my firm, and

24  one of the things that my firm does is provide ethics opinions

25  and ethics advice to attorneys, and we told them and helped

1  prepare papers for them indicating we didn't believe it was a

2  conflict.  Now, very often in these cases you find people who

3  care about ethics, write about ethics, judges, ethics

4  committees, grievance committees.  They can disagree.  There

5  can be reasonable disagreements between them about what the

6  rules meant.  We didn't believe at the time that it -- the Baum

7  firm didn't when it entered into the agreement.  We didn't

8  believe when they consulted us about it.  But again, they've

9  stopped doing it because enough people have raised concerns

10  about it.

11          But, what I would say, if you look back at the

12  purpose for which MERS was created, MERS was created as a way

13  for these servicers to move these papers very quickly.  And

14  MERS and these servicers entered into this agreement between

15  themselves.  The Baum firm did not negotiate the agreement

16  between MERS and BAC or any of the other numbers of servicers

17  that use this -- or mortgage holders that use this.  They

18  didn't negotiate that agreement.  They reached that agreement

19  on their own, and then they went out and asked Baum and other

20  lawyers in the state and across the country to designate people

21  who could sign these things on behalf of MERS.  It's an

22  agreement the parties reached between themselves, the agreement

23  -- the parties to that agreement, and then they asked the Baum

24  firm to -- and other law firms to provide people who could

25  sign.

1            THE COURT:  Why not go to an unrelated firm?

2            MR. DOYLE:  Well, it could -- it adds another step,

3  Your Honor.  Now, I mean, the lessons we're learning now is

4  there was a lot done to try to streamline the mortgage process,

5  and perhaps too much was done, but a lot was done to try to

6  make it quicker, to try to allow -- process it easier.  And if

7  I could go back to one other comment you made that, you know,

8  eventually there could be some problem.  The problem here is

9  not a problem between MERS and BAC.  They've raised no

10 objection to this.  They don't have a problem with this

11 conflict if there is one.  This is being raised by, in this

12 case, Mr. Bevins and Mr. Szumowski.  It's not a problem between

13 the parties.  They don't have any disagreement between

14 themselves about the assignment, how it was done and when it

15 was done.

16            And I would contend that if there is a conflict issue

17 -- and I understand what you're saying -- we don't believe

18 there was one, we would defend that, but, you know, that's

19 something that courts and judges and grievance committees have

20 to rule on.  If it is believed that there is a conflict that

21 should be raised in the context of a motion to disqualify the

22 firm, not a motion to deny the relief sought here, and

23 certainly not a motion for sanctions.

24            THE COURT:  But who's going to make the motion to

25 disqualify?

1          MR. DOYLE:  Well, I mean any of the parties to this

2     matter can make that motion.

3          THE COURT:  To disqualify --

4          MR. DOYLE:  The Baum firm.  I mean, at least in the

5     Szumowski case they continue to represent the bank.  In the

6     Bevins case they no longer do, so I don't think that's even an

7     issue there.

8          THE COURT:  Let me make an observation and ask a

9     question.  The observation is that perhaps you say that

10    everyone got together to try and streamline this.  And I assume

11    by streamlining that means that when the Baum firm is involved

12    we're inevitably talking foreclosures.  And hasn't that been

13    part of the problem that the country has faced in the last

14    year, year and a half, that these mortgages were fast tracked?

15    If anything the process should be slowed down, not -- don't

16    speed it up, because when you speed it up things happen, bad

17    things happen.  Usually not good things.  Bad things happen and

18    we've seen that.  And the ultimate result is that somebody is

19    going to be displaced.  Somebody is going to lose a home.  And

20    there are cases where that's going to happen, but I would

21    suggest that perhaps it's been happening far too often, and

22    perhaps not with valid legal underpinnings and valid legal

23    basis simply because of these type of things where we're trying

24    to streamline this and get it done as quickly as we can get it

25    done.

1          The whole problem -- well, one of the problems with

2   this whole situation is that once upon a time the mortgage

3   business involved a local bank and somebody going in and

4   borrowing some money to get a home for themselves and their

5   family and that stayed with that bank.  Now it's being looked

6   upon as something akin to the stock market and the stock

7   exchange.  They are exchanged all over.  People don't know who

8   holds their mortgage, who holds their notes.  There are

9   mistakes that are being made.  Mistakes are more common than

10  not.  I simply point out that I think that's part of the

11  problem, this whole concept of how are we going to make this

12  all faster.

13         Now, let me ask you this.  Suppose there was --

14  suppose there's a finding by somebody at some point, this court

15  or somewhere, that there was an ethical problem, what does that

16  mean in terms of the underlying commercial transaction?  Mr.

17  Kim would have me disallow this proof of claim based on either

18  the theory he didn't have standing or this conflict.  But, what

19  does that mean if there was a conflict?

20         MR. DOYLE:  I think this goes to the substantive

21  issue, Judge, so I'll let Ms. --

22         MS. GRIGG:  Your Honor, ultimately the assignment, it

23  wouldn't do anything towards the claim because in New York a

24  written assignment isn't required.  It's delivery of the

25  physical note.

1      THE COURT:  Well, I'm not saying the assignment, I'm

2  saying what if there was -- what if I say there was a conflict.

3  He shouldn't have done what he did.  There was an ethical

4  violation.  What does that mean in the terms -- if anything of

5  the underlying -- is that just a sanction against the firm for

6  being unethical, but the underlying transaction survives, or

7  does -- could that somehow affect the underlying commercial

8  transaction?

9      MS. GRIGG:  No, Your Honor, I don't believe there was

10  any affect on the underlying commercial transaction.  When the

11  debtor executed the note and mortgage he did so at his own free

12  will and consent.  He executed a mortgage that appointed MERS

13  as nominee.  There's a valid mortgage out there.  He's not

14  disputing that he signed a note and mortgage or that he owes

15  them the money.  And he's been -- he made payments prepetition

16  for a period of time.  I honestly don't know if he's been

17  making post-petition payments.  I did not ask my client for

18  those figures prior to coming here.  But, it's still -- the

19  underlying commercial transaction's legitimate.  This -- the

20  assignment has no bearing on the execution of those documents

21  at the time of closing back in 2004.  Ultimately BAC is the

22  current holder.  They have possession.  They are the ones with

23  the right to file a proof of claim.

24      THE COURT:  With all due respect I think that's the

25  primary question, are they making payments.  Because once

1  again, unless Mr. Kim is challenging the underlying transaction

2  this debtor, this individual, ultimately is going to be behind

3  the proverbial eight ball.  If they're not making payments for

4  some reason then at some point somebody is going to serve valid

5  foreclosure papers, and either they're going to have to cure it

6  or they're going to have to lose their home, but that's another

7  story.  Let me ask Ms. Penpraze.  What's your take, Ms.

8  Penpraze, on the second question, the ethical question, the --

9  not the standing, but what if -- was it ethical, and if not

10  what's the effect of that from the United States Trustee's

11  point of view?

12       MS. PENPRAZE:  I think, Your Honor -- thank you.  And

13  the larger picture is in the news in other cases that we've all

14  seen, the affidavits that have been submitted to the bankruptcy

15  courts, to the state courts, we're finding out now were not

16  accurate or robo-signed.  In fact, in this case the affidavits

17  submitted in support in Bevins for example in the attorney

18  affirmation, and with all due respect to Mr. Krauss, and the

19  client affidavit talk about they signed this in order to

20  straighten out the New York City Department of Finance records.

21  So, even the affidavit that this Court received in support and

22  trying to explain why they're legitimately a creditor contains

23  errors.  So, somebody's not looking, somebody's not reading,

24  somebody's not verifying.

25       THE COURT:  Let me ask you this, Ms. Penpraze.  Do

1  you think -- the same question.  If I find under whatever guise

2  or circumstances that there is some conflict that was there

3  what does that do to what's before me?  Does that just go as

4  against the Baum firm or does that go to the underlying

5  transaction?

6      MS. PENPRAZE:  I haven't researched that question,

7  Your Honor, but clearly it would go to the attorney.  I think

8  the attorneys would have to answer to that.  Whether or not

9  that is such a taint on the commercial transaction, that it's a

10  nullity, I do not know.  I think Mr. Kim has made a cogent

11  argument about the separation of the note and mortgage.  And I

12  have looked at those cases.  And when you separate it the

13  collateral is gone away, so now you have an unsecured claim.  I

14  think that would require extensive research and briefing before

15  I could answer that question.

16      THE COURT:  Well, counselors, let me throw this out

17  to all of you, some very interesting issues.  Mr. Kim teed this

18  up.  I have memos of law from everybody else regarding I think

19  the two questions, right?  The two questions, do we have an

20  effective commercial transaction because of the perceived

21  problems with the note?  Mr. Kim says that that's dispositive

22  and I think everybody else said it's no big deal because it was

23  delivered, it doesn't have to be recorded, formally assigned.

24  Mere delivery is enough to give them the full powers that the

25  note would allow.

1        And then there's a second question of this perceived

2   conflict regarding the attorney within the Baum firm and the

3   Baum firm itself, vis-a-vis the commercial transaction.  I'm

4   obviously not going to make any rulings today, but I simply

5   throw out to all of you what do we do with this?  Do I now get

6   briefs from Ms. Penpraze and Mr. Kim responding to the law that

7   you gave me?  Do you want to augment your law based on what

8   happened today?  How do we -- procedurally what do we do going

9   ahead?  Because, Mr. Kim, you want to -- you want the proof of

10  claim disallowed and you want the Baum firm sanctioned.  Are

11  those -- those are really the two things you want, is that

12  correct?

13       MR. KIM:  Yes, Your Honor.  And I really do think

14  they're unrelated except, obviously, they're in both these

15  cases.  In other words, the issues of what the attorneys did is

16  really separate from what I see as a substantive law issue of

17  whether or not there is, in fact, standing to have filed these

18  proof of claims.  And I'll just mention the U.S. Trustee points

19  to an error in the affidavit.  That error is very critical

20  because it's repeated in the memorandum of law that essentially

21  says they've kept -- this is the Bevins matter -- they've kept

22  that note in their custody and control except the time they

23  transferred it to the New York City Financial Board.  And I --

24  you know, I don't know where that was coming from.

25       But -- so -- and here is, in fact, the issue, Your

1  Honor, is there is obviously issues of law, but there's also an

2  awful lot of issues of fact here.  And the facts also are

3  changing.  As I pointed out we have a very different note

4  submitted in the foreclosure and the proof of claim than we do

5  have, in effect, now presented to you in their opposition in

6  the Bevins matter.  So -- and I certainly believe that there's

7  certainly some issues of law that we can brief that I'll

8  respond to, but there's also a lot of issues of fact here, and

9  as I said, they're changing which to me is an issue of

10  credibility also.

11        THE COURT:  Counselor, I didn't give you an

12  opportunity for -- on behalf of GMAC I believe in the Bevins

13  case.

14        MR. KRAUSS:  Correct, Your Honor.

15        THE COURT:  You're kind of in the middle of all of

16  this, as well.  Do you have arguments other than what we -- I

17  assume you have -- you subscribe to all of the arguments on

18  this side of the table.

19        MR. KRAUSS:  I do, Your Honor, and thank you.  Just a

20  couple quick points.  With all due respect, what Mr. Kim said

21  in terms of what the affidavit says is actually inaccurate.  It

22  doesn't say that the note and mortgage was released to the New

23  York City Department of Finance.  There is an error in our

24  papers, and that is the fault of our office -- my office.  The

25  -- and I've spoken to the U.S. Trustee about this subsequent to

1 the filing of the papers in that the affidavit.  And the reason

2 that was given for the filing of an assignment of mortgage

3 years after actual possession had been transferred to the trust

4 was to document in the land records.  And in error the New York

5 City Department of Finance, which is where an assignment of

6 mortgage in New York City would be filed, was put into the

7 affidavit in the brief instead of the Saratoga County Clerk's

8 Office.  That is an error in our papers and -- you know, and I

9 think that's what Mr. Kim was alluding to.  However, it wasn't

10 that the note and mortgage was released to the New York City

11 Department of Finance.  So, that's just one issue.

12        But, just to address Your Honor's question, I guess,

13 to the parties as to how we believe the Court and the parties

14 can proceed, given the issues raised here I would like an

15 opportunity and would suggest that we be given time to

16 supplement our papers, and I think one -- some other documents

17 that would be useful both for the U.S. Trustee as well as Mr.

18 Kim are documents from the custodian of records because what

19 you have here is an affidavit from a Mrs. Faber who works for

20 the servicer, GMAC.  It's not the custodian to the trust.  It's

21 not the party that holds the mortgage on behalf of the trust.

22 And so, I'd like to be able to provide other information and

23 documents to document that the trust had in its possession

24 through its agent the note and mortgage since, you know,

25 December 1st, 2006, which was the date of the pooling and

1  servicing agreement or whatever date is required under that

2  agreement.  And then in that case Mr. Kim and the U.S. Trustee

3  can respond to that.  I think it would not be efficient if Mr.

4  Kim were to respond now and then I would be requesting --

5           THE COURT:  Well, this is teed up as objection to

6  claims.  Really it's just -- it's a claims objection in both

7  cases.

8           MR. KIM:  And I am objecting to their objection to

9  our confirmation of the plan at this point.

10           THE COURT:  What's the status of confirmation?

11           MS. BAKER:  It's scheduled for today.

12           MR. KIM:  In both cases.

13           THE COURT:  So, there's an objection to claim.  Well,

14  they're really separate and distinct.  There's an objection to

15  claim and you're responding to their objection to confirmation

16  by saying they have no standing to object to confirmation.

17           MR. DOYLE:  Yes, Your Honor.

18           THE COURT:  Well, let me -- I don't think we're going

19  to put our names to any confirmation orders today.  What if we

20  take one step back and we have Mr. Kim's motions for today --

21  well, his objection to claim and his response to your objection

22  to confirmation that you don't have the ability to object to

23  the creditor.  Maybe the way to do this is to simply give the

24  creditors an opportunity to augment their pleadings and then to

25  give Mr. Kim and Ms. Penpraze an opportunity to submit memos of

1  law and/or respond and then -- I don't know if this is going to

2  come down to a question of law or if there's some sort of

3  question of fact to resolve the objection to claim and the

4  objection to confirmation in the plan or where we're going to

5  go, but it seems like we should at least get everyone's papers

6  as best we can at this point and then see where we are.  Does

7  that make some sense as to how to proceed?

8          MR. KIM:  Your Honor, the only -- the concern I have

9  is that we can get lots -- the creditors can get lots of

10  affidavits from lots of different people.  I'm hearing now that

11  apparently Judy Faber who submitted an affidavit as the

12  custodian of GMAC Mortgage isn't really the custodian that we

13  have to rely on to know that, in fact, this note was held.  You

14  see the problem here?  The goal posts keep moving.  And at some

15  point the question of credibility of what you're seeing --

16          THE COURT:  Absolutely.  Absolutely.

17          MR. KIM:  -- and that I don't -- you know, perhaps my

18  -- I have to consult with my debtors as to an adversarial, but

19  we're going to get a lot of affidavits and they're going to

20  smooth over -- they're going to address, I'm sure, a deposition

21  where Judy Faber basically says when she's asked about an

22  affidavit in support of a motion -- a foreclosure, I never

23  signed it.  So, my concern is is we're going to get a lot of

24  different affidavits here.  There's credibility issues here

25  that I'm not sure how this Court gets to really get to the

1   issues I think that are critical.

2          THE COURT:  Well, Mr. Kim, maybe we get the amended

3   augmented pleadings from the creditors and then maybe you get

4   -- you want some discovery before you respond.  Maybe you want

5   to challenge the credibility of this whole -- I mean, maybe

6   this is a house of cards that you're going to pull one out and

7   the whole thing's going to collapse.  I don't know.

8          But, that's the kind of question I think that we have

9   to ask because ultimately, once again, we're still within the

10  confines of a 13.  We're going to try and save these debtors'

11  homes.  I assume they're either paying somebody ongoing or

12  they're putting that money in escrow so that the debtor is not

13  going to get farther behind -- further behind before they get

14  out of this.  I mean, I assume you're addressing that problem.

15         MR. KIM:  And, Your Honor, one of the issues that I

16  did want to address with the Court because you had asked about

17  was ongoing mortgage payments.  As soon as we discovered this

18  we instructed our clients to cease paying their ongoing

19  mortgage payments.  They are continuing and I believe they're

20  both current based on my last conversation with the payments to

21  the Chapter 13 because ultimately that is the issue is are we

22  paying the right people.  And I don't --

23         THE COURT:  There's a payment to the trustee?

24         MR. KIM:  -- have any problem with instructing my

25  clients to start paying the trustee ongoing mortgage payments

1    until it's resolved.

2              THE COURT:  Well, it seems you've got to pay

3    somebody.  Unless you're challenging the underlying debt,

4    that's just a recipe for disaster.

5              MR. KIM:  Understood, Your Honor, but we didn't want

6    to hear from creditors saying, well, they're paying us so they

7    obviously believe that they're owed the money.  And at the

8    point that these proof of claims were discovered -- filed, we

9    -- I instructed my clients that we were going to object to them

10   and we were going to be -- and not to --

11             THE COURT:  And that's perfectly proper.  You can

12   certainly object to ongoing payments to mortgages.  The problem

13   though is that ultimately if you don't prevail these debtors

14   are really out there --

15             MR. KIM:  Yes, Your Honor.

16             THE COURT:  -- unless they have a pot of money that

17   they can tender to somebody as this Court directs.  But, if

18   they're just not paying anybody and they're just ignoring that,

19   I'm not comfortable with that one, Mr. Kim.

20             MR. KIM:  And as I said -- and this is why I offered

21   that issue, Your Honor -- is perhaps there's an interim order

22   that allows the trustee to take this money until we resolve

23   this issue.

24             MS. BAKER:  If you're suggesting a post-petition

25   conduit payment I would want to be involved in the drafting of

1  any order I consent and we would need some parameters.  I think

2  we've talked to the Court about --

3      THE COURT:  I don't think we're talking about a

4  conduit payment.  I think we're just talking about the conduit.

5  It comes to you and it's going to stay there until there's a

6  further order of the Court or the parties agree on something,

7  but I think these debtors should be paying these ongoing

8  payments to somebody.

9      MR. KIM:  I agree, Your Honor.  We just -- that's why

10  we wanted to have this hearing in December.  We wanted to move

11  this very quickly.

12      MS. BAKER:  They could be placed in Mr. Kim's escrow

13  account and he could periodically report to us if that --

14      THE COURT:  That's fine, too.

15      MS. BAKER:  -- if you would be comfortable with that.

16  I would prefer that.

17      MR. KIM:  Okay.

18      THE COURT:  So what do we do today?  The two things

19  have been teed up; the claims objection and the response to the

20  objection to confirmation.  How do the three of you -- what

21  would you suggest?  How much time do you need to do what?  What

22  do I do with my docket today?

23      MS. BAKER:  The point of view from my objection to

24  claim, I think my issues are a little more simple than that

25  with GMAC because we're not involved in a securitized trust.

1  There's not a document custodian and a servicer.  It's -- BAC

2  is the end all, be all.  You know, it's a one stop shop

3  basically.  They hold the note.  There's not someone servicing

4  on their behalf, holding a document on another behalf.  So, we

5  -- if, you know, in light of the question of, you know, if the

6  assignment isn't valid does that render a commercial

7  transaction invalid, I believe we've addressed that in our

8  papers.

9          THE COURT:  And the conflict issue.

10         MS. BAKER:  And the conflict issue.

11         THE COURT:  The perceived conflict issue.

12         MS. BAKER:  The perceived conflict issue in light of

13  those issues that we have addressed, those in our papers, but

14  in light of the Court's concerns raised today I would like a

15  chance to augment those papers.

16         THE COURT:  And you certainly don't have to.  I

17  simply throw that out.  Do you want to do that before I have

18  Ms. Penpraze and Mr. Kim respond somehow, be it submissions of

19  memos of law, request for discovery.  I don't know what they're

20  going to want to do, but I want to make sure that we had your

21  last word on his motion and then we'll see how the movants want

22  to -- how they want to respond.

23         MS. GRIGG:  From the point -- from BAC's standpoint I

24  would like to reserve our right to submit additional papers.

25         THE COURT:  How much time do you need to answer

1   whatever you want to answer, whatever you want to submit,

2   argument, affidavit, law, equity, whatever you want me to

3   consider?

4            MS. GRIGG:  I would --

5            MR. DOYLE:  Your Honor, if I could.  Not to

6   complicate things, but in our papers we had raised the issue --

7   and I don't know, and I'm not asking the Court to tell me -- if

8   sanctions are -- you know, if the possibility of sanctions from

9   the Court is there our position is procedurally that a separate

10  motion for sanctions is necessary --

11           THE COURT:  Rule 11 just is not there.  You have to

12  follow -- you have to work your way through all of the Rule 11

13  guidelines, the Safe Harbor and all of that.  That wasn't done.

14  So, I don't think Rule 11 is on the table at this point until

15  and unless it's teed up.

16           The 105, I'm very reluctant to go down that road

17  unless it's absolutely clear and absolutely necessary.  I think

18  that's on the table, but somebody would have to show me why I

19  would go down that road.  There would have to be some pretty

20  heinous stuff going on for me to do that, and if I were going

21  to do that I think I would -- procedurally would be a show

22  cause to the affected entity or person as to why they shouldn't

23  be sanctioned under 105 because A, B, C, D, and let somebody

24  respond.

25           MR. DOYLE:  That was exactly my point, Your Honor.

1  And so, I think in terms of that issue, which is the only issue

2  I was appearing on, I'm fine to let these other bright

3  attorneys handle the substantive issues.

4         THE COURT:  I think there's still the substantive

5  conflict issue as does that have an affect under the -- how

6  does that fit in -- assuming I agree that there was a conflict

7  and -- how does that fit in separate and apart from the

8  possibility that I issue an order to show cause as to why

9  somebody shouldn't be sanctioned for doing whatever it is we

10 ultimately find out that you did.  So -- Ms. Penpraze?

11        MS. PENPRAZE:  Your Honor, echoing Mr. Kim's concern,

12 when we get to the issue -- once we have all the affidavits

13 that we're going to get and we have the facts set because I do

14 recognize that they are changing, and I did make a note about

15 Ms. Faber not being the custodian, and in here it says she is,

16 so there's confusion about that.  Once we get to the point

17 where the creditors have submitted whatever --

18        THE COURT:  It's in concrete.

19        MS. PENPRAZE:  -- they want to submit I think we need

20 the opportunity for depositions because how else can I question

21 or vet whether Ms. Faber -- what was her state of mind?  What

22 was her knowledge at the time that she signed these things?

23        THE COURT:  I absolutely agree and that's why I think

24 we need to get their response so you -- the two of you can

25 intelligently say I'm just going to submit a memo of law or I

1 want to depose somebody, whatever you want to do.  And I don't

2 think we'll know that until we know what the exact positions

3 are in concrete so that they're not going to change again.  So,

4 once again I'll give you whatever time you want to give me

5 whatever you want, but then I'm going to hear from the United

6 States Trustee, Mr. Kim, as to what is appropriate at that

7 point, and it may well be depositions and we go down that road.

8 I don't know.  But -- so I think the first question is is how

9 much time do you need to give me whatever you want now that

10 we've gone through this morning to augment the papers if you --

11 you don't have to -- you can stand on the papers you submitted

12  -- to answer Mr. Kim's motions?

13          MR. KRAUSS:  Your Honor, if I may.  I would like two

14 weeks to submit papers -- supplemental papers to Mr. Kim's

15 motion, the U.S. Trustee's motion, as well as to address some

16 of the issues raised today.

17          THE COURT:  I don't think you have a motion.  You're

18 just supporting Mr. Kim.

19          MS. PENPRAZE:  I wouldn't even say that the U.S.

20 Trustee is necessarily supporting the debtor's motion.

21          THE COURT:  You got papers in.

22          MS. PENPRAZE:  We have our own response because I

23 believe we have our own issues.

24          THE COURT:  Okay.

25          MS. PENPRAZE:  And from the U.S. Trustee's position,

1  it goes to the integrity of the system, and this -- these just

2  happen to be the cases where, you know, the issues are right at

3  the forefront.

4           THE COURT:  And let me say I'm very interested --

5  well, I'm interested obviously in Mr. Kim's individual concern

6  regarding his clients.  And these cases, there is a much larger

7  concern amply indicated by Ms. Penpraze about the sanctity of

8  the system and we've had other creditor issues recently and

9  it's been a long, torturous road at times to try and figure

10  some of these things out.  But, clearly, the system has to be

11  as pure as we can make it, and so that is a whole separate and

12  distinct as to how are we doing this systemically and is it

13  properly being done.

14           MS. PENPRAZE:  And if I might add, Your Honor, I have

15  been in discussions with Ms. Grigg, Mr. Krauss, and, I'm sorry,

16  I forgot Vincent's last name.

17           MR. DOYLE:  Doyle.

18           MS. PENPRAZE:  Doyle.  And we are in discussions

19  about how do we go from here.  The facts of these cases will

20  flesh themselves out and whatever the results are the results

21  will be.  But, we are in discussions about how do we approach

22  this going forward, and I have to say that they're very

23  receptive and we're exchanging information on that --

24           THE COURT:  Okay.

25           MS. PENPRAZE:  -- and we're trying to accomplish

1  that.

2         THE COURT:  So, counsel, you said you want two weeks

3  to give me whatever it is you want.  Counselor, is that enough

4  time?  Because if you want three -- whatever reasonable time

5  you want I'll certainly give you.

6         MS. GRIGG:  Two weeks should be fine, Your Honor.

7         THE COURT:  Okay.  So, if today is the 13th, what if

8  I say that anything that creditors want to submit will be in by

9  the close of business on Friday the 28th?

10        MS. GRIGG:  That's fine, Your Honor.

11        THE COURT:  Counselor, does that work?

12        MR. KRAUSS:  Thank you, Your Honor.

13        THE COURT:  Then what if Mr. Kim -- Ms. Penpraze,

14 should I simply adjourn this motion -- these motions to early

15 February to see what your response is?  Whether you just want

16 to submit legal argument or whether you want depositions or how

17 you want to proceed on these?  Does that --

18        MR. KIM:  I'd be comfortable with it here having some

19 kind of check-in with you, Your Honor, post getting their

20 briefs.

21        THE COURT:  Well, if you get everything by the 28th

22 how much time do the two of you need to digest this to decide

23 how you want to proceed procedurally and substantively?

24        MS. PENPRAZE:  Two weeks is fine if we are looking at

25 the second week of February.

1          MS. O'CONNELL:  So, they're not going to file

2     anything?  They're just going to come back?

3          MS. PENPRAZE:  For a status conference.

4          THE COURT:  For a status conference before they

5     necessarily do anything?

6          MR. KIM:  February -- the second week of February is

7     fine for me.

8          THE COURT:  February 10th?

9          MR. KIM:  That will be fine, Your Honor.

10          THE COURT:  Then why don't we simply say we're going

11     to adjourn this -- let's put it on a different time, Ms.

12     O'Connell.  And, counselors, what I would suggest we do, if

13     this is a status conference to -- it's not going to be arguing

14     -- what if we do this telephonically and we save you all the

15     trip.  We'll put you on the phone.  And, counselor, I don't

16     know if you want to be on this one or not or --

17          MR. DOYLE:  It doesn't sound like I need to, but I

18     will consult with the --

19          THE COURT:  Okay.

20          MR. DOYLE:  -- Baum firm about it, Your Honor, unless

21     you -- if you want me to I obviously will be, but otherwise --

22          THE COURT:  Only if you feel the need to do so.  When

23     can we do this, Ms. O'Connell?

24          MS. O'CONNELL:  Do you want to do like at the end of

25     the day on the 10th?

1          THE COURT:  What if we do it mid-afternoon if that

2   works for everybody?

3          MS. O'CONNELL:  At 1:30?

4          THE COURT:  Is that convenient for everybody if we

5   put you on the phone?

6          MS. GRIGG:  Yes, Your Honor.

7          MR. KRAUSS:  That's fine, Your Honor.  Thank you.

8          MS. GRIGG:  Do you want all parties on the phone,

9   local parties here?  Mr. Kim?

10         THE COURT:  Oh, I don't want to drag Mr. Kim down

11  from --

12         MR. KIM:  I may be down here.  It that a -- I may be

13  down here anyway, so I can --

14         THE COURT:  In the afternoon?  Well, why don't we say

15  we're going to do this telephonically.  Ms. --

16         MS. BAKER:  I'll be here.

17         THE COURT:  You'll be here.  So, Ms. Baker will be

18  here.  Why don't we say Ms. Baker and Ms. Penpraze will be here

19  and then we have three other parties.  We can accommodate them

20  under our own aegis and we won't have to get outside conference

21  calls involved.  And then Mr. Kim may well be here.  If that's

22  the case that's fine.  But we'll put the two of you on the

23  phone, so if you just make sure Ms. O'Connell knows where to

24  reach you at 1:30 on the afternoon on the 10th and then we'll

25  figure out what the -- what Mr. Kim and Ms. Penpraze wants.

1  We'll go down that road.  And then you may well have to come

2  back with personal appearances, but we can certainly try and

3  save you that time on the 10th.

4        MS. BAKER:  Your Honor, confirmation is scheduled for

5  today on both of these, so I'd like to adjourn that out to the

6  10th as well and we'll just keep adjourning it out.  But, the

7  Court did ask about the status of the payments, so I'd just

8  like to report that in the Szumowski case the debtor is due for

9  the December payment.  The payments were supposed to be $200

10  per month.  And the other case the debtors are on a wage order

11  and they're current.

12        THE COURT:  So, on the other one, Mr. Kim, let's make

13  sure --

14        MR. KIM:  Yes, Your Honor.

15        THE COURT:  -- that the payments are there so we

16  don't get into issues about defaults and dismissals.

17        MR. KIM:  Yes, Your Honor.

18        THE COURT:  Counselors, what else do we need to do

19  today, if anything?

20        MS. PENPRAZE:  Your Honor, what's the agreement about

21  the ongoing mortgage payments?  I have a concern that we're

22  going to go down this path and then if the cases wind up

23  dismissed we'll be in trouble.

24        MR. KIM:  Your Honor, if the Court's fine with us

25  taking it in escrow I will instruct the clients to do that.

1          THE COURT:  So, Mr. Kim, we're going to assume that

2    you're going to start receiving the ongoing payments, whatever

3    they are, and that if for whatever reason they don't make that

4    payment I would expect you would send a letter to the Court and

5    the parties indicating there was a default just to -- and then

6    that may lead us a different way.  So, I'm just assuming your

7    clients are going to stay current with you --

8          MR. KIM:  Yes, Your Honor.

9          THE COURT:  -- pending further order of the Court and

10   current with the trustee.

11         MR. KIM:  Mm-mm.

12         THE COURT:  Okay.

13         MS. GRIGG:  Your Honor, if you'd like we can provide

14   Mr. Kim with a current post-petition --

15         THE COURT:  That would be great so we know.  Is there

16   any issue on --

17         MS. GRIGG:  -- history so that he knows exactly what

18   his clients are doing.

19         THE COURT:  -- Bevins as to what the current status

20   of the mortgage is, the payments are?

21         MR. KRAUSS:  I believe, but I'd like to verify, Your

22   Honor -- but I believe that they -- the last payment was in

23   October.

24         MR. KIM:  Yes.  That's about right.

25         THE COURT:  Okay.  So, at some point then we're going

1  to have the issue of November, December.

2            MR. KIM:  Yes.

3            THE COURT:  But let's at least start making ongoings

4  --

5            MR. KIM:  Mm-mm.

6            THE COURT:  -- and they'll be held with you pending

7  further order of the Court.

8            MR. KIM:  Okay.  Thank you, Your Honor.

9            MS. O'CONNELL:  So, Judge, I'm just indicating that

10 any further pleadings regarding both motions by the creditors

11 are due January 28th and then we're adjourning to the 10th at

12 1:30 by phone.

13           THE COURT:  Correct.  Counselors, is there anything

14 else we need to do?  Does that take care of what we can do

15 today?

16           MR. KRAUSS:  Thank you, Your Honor.

17           THE COURT:  If not, thank you all very much.  Safe

18 travels home.

19           MS. GRIGG:  Thank you, Your Honor.

20           MS. PENPRAZE:  Thank you.

21           THE COURT:  Thank you.

22                         *  *  *  *  *

23

24

25

47

## C E R T I F I C A T I O N

      I, KATHLEEN BETZ, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Kathleen Betz          DATE:  January 23, 2011

KATHLEEN BETZ

J&J COURT TRANSCRIBERS, INC.