UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

IN RE:                          .   Case Nos. 10-12431 (REL)
                                .             10-12856 (REL)
JOHN C. SZUMOWSKI,              .

        Debtor.                 .
. . . . . . . . . . . . . . ..  .   James T. Foley Courthouse
                                .   445 Broadway
IN RE:                          .   Albany, NY 12207
                                .
GEORGE BEVINS,                  .
                                .
        Debtor.                 .   February 10, 2011
. . . . . . . . . . . . . .      .   1:35 p.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE ROBERT E. LITTLEFIELD
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

APPEARANCES:

For the Debtors:            Law Offices of Ronald J. Kim
                            By: RONALD J. KIM, ESQ.
                            36 Long Alley
                            Saratoga Spring, NY 12866

For the U.S. Trustee:       Office of the United States Trustee
                            By: LISA PENPRAZE, ESQ.
                            74 Chapel Street, Suite 200
                            Albany, NY 12207

For the Chapter 13          Deily, Mooney & Glastetter, LLP
Trustee:                    By:  BONNIE S. BAKER, ESQ.
                            8 Thurlow Terrace
                            Albany, NY 12203


Audio Operator:             Vicki Griffin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609)586-2311     Fax No. (609)587-3599**

2

```
APPEARANCES (Cont'd):

For BAC Home Loan          Steven J. Baum, P.C.
Servicing, LP:             By:  NATALIE GRIGG, ESQ.
                           220 Northpoint Parkway, Suite G
                           Amherst, NY 14228

For Deutsche Bank Trust: Hinshaw & Culbertson, LLP
                           By:  SCHUYLER KRAUS, ESQ.
                           780 Third Avenue, 4th Floor
                           New York, NY 10017

                           ---
```

1         COURT CLERK:  We're going to go right on the record

2  regarding a case of John Szumowski, 10-12431 and this is an

3  objection to claim and also the George Bevins case, 10-12856

4  and this is also an objection to claim.

5         Will the parties enter their appearances for the

6  record?

7         MR. KIM:  Ronald Kim for the debtors.

8         MS. BAKER:  Bonnie Baker on behalf of the Chapter 13

9  Trustee.

10        MS. PENPRAZE:  Lisa Penpraze, Office of the United

11 States Trustee.

12        MS. GRIGG:  Natalie Grigg from Steven Baum's office

13 on behalf of BAC Home Loan Servicing.

14        MR. KRAUS:  Schuyler Kraus in the Bevins matter on

15 behalf of Deutsche Bank Trust Company as trustee.

16        THE COURT:  Counselors, let's see if we can all get

17 up to date.  Mr. Kim files a motion and in effect objects to --

18 wants me to -- as I understand, Mr. Kim, you can correct me if

19 I'm wrong, expunge a claim, overrule objections to

20 confirmation, investigate and react and do what is appropriate

21 regarding what he claims is a fraud on the parties and the

22 Court, ultimately looking for sanctions and attorneys' fees.

23 This was called before.  There was initially a question about

24 some of the original paperwork, and as I understand the

25 documents in question have been produced and, Ms. Penpraze, you

1  have seen those or somebody in your office has, why don't you

2  at least fill in that piece of the puzzle.

3          MS. PENPRAZE:  Thank you, Your Honor.

4          The original document in the Szumowski case that Ms.

5  Grigg has was viewed by the trial attorney in the UST's office

6  in Buffalo and in New York the original note and mortgage that

7  Mr. Kraus have in the Bevins matter was viewed by one of the

8  trial attorneys in our Manhattan office.  So, I have

9  communicated with them and, in fact, Ms. Grigg has circulated

10 and I believe filed on ECF a copy of the original note that she

11 actually has in her office.

12         You know, my concerns about it, which I've expressed

13 to all the attorneys here yesterday via e-mail, is that the

14 notes don't match up.  We have different versions attached to

15 different affidavits attached to different proofs of claim.  I

16 have gone ahead and laid it out myself visually on a

17 spreadsheet so I could track where the differences were and at

18 some point perhaps the Court might want to see that, but for

19 purposes of today I've already circulated it to the attorneys.

20 So, without going into every detail there are a lot of

21 discrepancies, Your Honor.  They're internally inconsistent.

22 The affidavits are inconsistent with each other.

23         THE COURT:  So, to your -- for your -- from where you

24 sit today, Ms. Penpraze, what do you see as the implications in

25 the larger picture based on what you know now?  What questions

1 are still there and what implications are still there?

2          MS. PENPRAZE:  I think there are essentially two

3 things.  One is, are the proofs of claim accurate?  And I think

4 everyone would probably agree that they're not based on the

5 documents that are actually in the record.

6          THE COURT:  When you say "accurate" are you referring

7 to the underlying validity of the entire transaction, or just

8 the numbers of arrears or the numbers of the payoff, when you

9 say the accuracy what --

10          MS. PENPRAZE:  Neither of those two things, Your

11 Honor.  My concern has been from the beginning the -- our

12 ability to rely on the documents that have been filed and that

13 are in the record in these two cases, and I think now that

14 we've seen the original documents and we've seen all the

15 affidavits it's clear that we cannot rely on the proofs of

16 claim nor the affidavits.

17          THE COURT:  So, what does that mean as a gut reaction

18 to you right now?  Do you still question the underlying -- do

19 you agree with these questions regarding Mr. Kim's allegation

20 that these entities have standing, is there a valid obligation?

21 What -- how far does this go?

22          MS. PENPRAZE:  I think I would defer to Mr. Kim on

23 those issues because from the United States Trustee's

24 perspective it's not our issue really what the debtor owes, how

25 much they owe.

6

1        THE COURT:  Well, let me rephrase that then.  The
2  United States Trustee obviously doesn't take an issue with
3  that.  The United States Trustee is more interested in the
4  integrity of the whole process.  What implications are there to
5  you -- how deeply do we seem to have an integrity issue going
6  at this point from what you've been able to see?  It sounds
7  like your concerns have not been alleviated.  Can you --
8        MS. PENPRAZE:  You know, I think on the record that
9  we have now I don't believe that there's a 9011 motion at this
10  point.  So, right now I think we're limited to the motion
11  that's before the Court that Mr. Kim has filed.  From my
12  perspective I would probably go down that path based on --
13        THE COURT:  Which path?
14        MS. PENPRAZE:  -- 9011 for sanctions, based on the
15  documents that are in the record at this point.  Whether or not
16  the underlying transactions are valid I don't, at this point,
17  have an opinion.  I would tend to believe that they are still,
18  but I would leave that to Mr. Kim to argue because that's
19  really his area at this point.  That's -- the debtor -- the
20  debtors and the United States Trustees have different agendas,
21  obviously, on these motions.
22        THE COURT:  They have numbers, you have integrity,
23  not to simplify to it that point, but you're looking beyond
24  this case to the totality of the system.
25        MS. PENPRAZE:  Correct, Your Honor, and, in fact, as

1  I'm putting research together I have confirmed that with

2  respect to BAC and GMAC there are similar cases in other

3  bankruptcy courts throughout the country with what I believe

4  are probably similar fact patterns that are in the discovery

5  stage now.  So, this is not an isolated incident.

6          THE COURT:  Ms. Penpraze, does this -- from what I

7  understand of the facts this bears no relation to the recently

8  completed situation that we had with the other law firm

9  regarding a claim made where there actually was no basis for a

10 secured claim being filed.  You're -- you haven't gone --

11 crossed that bridge or have -- you see that issue?  When you

12 say you're not at this point challenging the underlying

13 validity of the obligation I assume that means that it would

14 appear somebody is secured, but you're questioning the

15 documents that have been presented to this Court.  Is that

16 where we are?

17         MS. PENPRAZE:  I believe that's an accurate

18 assessment of where I think we are.  Obviously, I'd want to

19 reserve any rights --

20         THE COURT:  Obviously.

21         MS. PENPRAZE:  -- to whatever arguments I may have

22 down the road, but I don't -- from my perspective I don't think

23 the mortgages themselves are invalid although there are layers

24 to this because once you get into this -- the trust agreements

25 and this REMIC Trust I don't really know the answer, but I do

8

1  think it does have some similarities to the Kaylor (phonetic)

2  case that I believe you're referring to --

3           THE COURT:  Yes.

4           MS. PENPRAZE:  -- in that we have attorneys that are

5  filing things that we're finding out aren't accurate and then

6  that opens up a whole other door and it concerns the United

7  States Trustee very much that we cannot rely on the filings

8  that are being made before this Court.

9           THE COURT:  Ms. Baker, Ms. Celli, does the Chapter 13

10  Trustee take a position at this point on any or all of this, or

11  do you have your own issues or are you interested observers?

12  What's your --

13           MS. BAKER:  We're interested observers at this point.

14           THE COURT:  Mr. Kim, since we were last here and the

15  -- there have been other pleadings filed, other documents

16  produced, has the debtor's position changed at all, is it -- is

17  the situation, in your view, the same, better, worse?  Where

18  are we after these documents that Ms. Penpraze refers to that

19  have been produced, has that helped the situation, exacerbated

20  the situation?

21           MR. KIM:  It depends on which case we're talking

22  about to sort of take them apart.  In the Bevins case I think

23  basically there's a much stronger argument that the current

24  creditor, however we want -- whatever we want to call him, does

25  not have standing to file the instant proof of claim and that's

1  based on the analysis of the information that they provided

2  relating both to the two versions of notes, the pooling and

3  service agreement that they submitted and really the applicable

4  law.  If you agree with their law that the -- and I do, that

5  the note is essentially the key document, that has to be

6  negotiated for them to have standing.  What they have actually

7  provided when you look under it is clearly they do not have

8  standing and we can go into that details.

9          Now, in Szumowski I'm a little stressed that, in

10 fact, now through the U.S. Trustee's Office that I'm learning

11 that there's yet another note which I don't even -- have never

12 seen.  I understand it's been filed, but so I -- all I can say

13 at this point is, these continued new notes, which also

14 appeared in the Bevins case, is part of the issue of why we

15 brought these in the first place is that the notes were

16 deficient to begin with and then there were new notes that

17 showed up.  And I think there's lots of questions when you're

18 in a bankruptcy court about whether or not that's appropriate,

19 whether or not that does, in fact, secure these creditors,

20 et cetera.  But, at this point what I -- you know, having

21 reviewed their information I still believe that this Court has

22 a strong foundation to dismiss the proof of claims because they

23 simply do not have standing, either of these creditors has not

24 demonstrated that.

25          THE COURT:  Mr. Kim, let me ask you this, you filed a

1 motion, contested matter, wanting me to expunge the claim, does

2 that mean that you want me literally to just expunge the claim

3 for distribution purposes in this case, or does this go to

4 something more akin to an adversary proceeding, are you

5 challenging the underlying validity of the underlying security

6 instrument itself such that you want me to deal me with the

7 underlying lien, or is it just the temporary problem of the

8 Chapter 13 --

9          MR. KIM:  Well, Your Honor --

10          THE COURT:   -- or something in between?

11          MR. KIM:  Well, Your Honor, actually that is the next

12 step for my debtors is that based on the information, as I

13 said, that's been provided, not only the initial information

14 that responded to our objections, but now the sort of second

15 try, if you will, by the creditors, I believe that we are going

16 to file adversarials to expunge the security liens on these.

17          THE COURT:  Is it your position now that your client

18 owns this house free and clear that they don't owe money to

19 anybody, or is it a different entity that you don't know the

20 identity of, or what --

21          MR. KIM:  Well, the only way to answer that, Your

22 Honor, is to take Bevins, specifically.  In <u>Bevins</u> we have a

23 note that was initially devoid of any endorsements.  The

24 argument that the creditors are making is those -- that

25 essentially the mortgage assignment which we originally led

1  with is irrelevant to this, doesn't really mean anything,

2  doesn't really do anything. Okay, fine, I'll take their

3  argument on its face is that's true.  I think there are some

4  arguments to be made to the contrary, but take that on its face

5  then --

6        COURT CLERK:  I'm sorry, when you say no endorsements

7  do you mean no (indiscernible), no witness signatures or

8  unsigned?

9        MR. KIM:  Essentially, Cindy, what I mean by that is

10  if you look at their Exhibit A they have these endorsements

11  which apparently were on the back of --

12        THE COURT:  Of the note.

13        MR. KIM:  -- the note.  If you look at the original

14  proof of claim note you, there is no endorsements on it.  Now,

15  I think what they're alleging is that, in fact, they're on the

16  back.  But, there is from an evidentiary standpoint a big

17  difference between the note that you don't see any bleed

18  through, but you do see a bleed through here.

19        But, let's take it on its fact that those

20  endorsements were correct, that essentially they moved those to

21  the proper party.  There is an endorsement by a Nancy Figgie

22  (phonetic) from Residential Funding -- from Homecomings, who

23  she apparently represents, to Residential Funding Corporation

24  Company.  Then, there's an endorsement from Residential Funding

25  Company to Deutsche Trust Company as Trustee by Judy Faber and

12

1 we can get into issues relate -- Judy Faber is somebody who has

2 been in -- deposed and there is substantial issues about her

3 credibility and her knowledge about even doing these and also

4 issues about whether or not, in fact, she even signs these

5 documents.  She has admitted in a deposition that, in fact,

6 this is a stamp.  This entire -- these are just stamps and

7 she's also admitted that that stamp has been used outside of

8 her presence.

9         But, here's the critical part is when you take the

10 PSA in the Bevins case, you analyze the terms, there's Section

11 201 of the PSA basically talks about how the mortgages have to

12 be assigned.  This is the controlling document in the transfer

13 of the documents.  Basically what it does is -- and there's

14 even a chart, this chart was not actually disclosed by the

15 creditors at this point, but it is attached to the PSA.  This

16 clearly shows the transfer of these notes going into the trust.

17         Well, you've got the mortgage seller and the mortgage

18 seller is Homecomings.  They transfer to Residential Funding

19 Corporation, LLC; good to go.  That's clearly on this

20 endorsement, question whether or not that endorsement was

21 appropriately done, but then Residential Funding Corporation is

22 to transfer that note to Residential Accredit Loans.  That --

23 there is nothing on this note that demonstrates a transfer to

24 that depositor and it does get confusing because these

25 corporations sound all the same, but Residential Accredit Loans

13

1    does not appear even on the second note and how it was

2    endorsed.  Then, it passes to Deutsche Bank who is the current

3    alleged holder.  So, basically this pattern had to have

4    happened by 12/2006 or it's -- or they don't have standing.

5         So, in the Bevins case I do believe there's

6    conclusive evidence that, in fact, based on their own

7    submissions that there is no standing for them to file this.

8    Now, is there somebody else out there, Your Honor?  I don't

9    know.  I can't --

10         COURT CLERK:  So, your theory it's Residential

11   Funding that actually still holds the note, assuming these

12   stamps are legit because that's where the break in title

13   occurred.

14         MR. KIM:  Well, the -- well, actually what I'm saying

15   is I liken it to -- the way I've described this before is, you

16   know, in the Olympics, you know, you have that relay race where

17   they pass the baton.  If you pass the baton one, two, three,

18   four, they win.  If you -- if one passes it two, but two passes

19   it to four, they lose.  What you have here is two passing it to

20   four.  That, in fact, they went from Residential Funding

21   Corporation to Deutsche Bank through Judy -- that's essentially

22   where the baton dropped.  That, in essence, Residential

23   Accredit Loans had to pick up the baton and it never happened,

24   by their own submissions, and that again sets aside the fact of

25   when these endorsements were made, the credibility behind these

14

1  endorsements and the other -- and what we think are significant

2  evidentiary issues.

3          THE COURT:  Mr. Kim, while I'm obviously concerned

4  about all of these issues I'm also concerned about the one that

5  I posed.  Your client at some point may well be on the

6  receiving end of some sort of foreclosure or other action

7  involving somebody else with this mortgage.  Don't we have an

8  obligation, as well, to try and figure out if this bank isn't

9  the right one to figure out where money should be going?

10 Otherwise, your client is, in effect, being harmed by this

11 entire process, by the 13 itself because she's getting --

12 they're getting further behind before they're -- if there's an

13 entity out of there -- if this isn't the right entity and there

14 is a valid obligation bad things are going to happen down the

15 road and how -- can we address that, is that part of this,

16 should that be part of that -- this?

17         MR. KIM:  Well, my debtor at this point is not, you

18 know, essentially looking just to get, as some people have

19 called a -- you know, talked about the moral hazard of a free

20 house.  What he's look -- he wants to be assured that, in fact,

21 this is the right party that's asking for the money because

22 bear in mind this has been discussed.  There are potential

23 significant title issues down the road for my clients.  The

24 risk is on them if, you know, some day they sell this.

25         THE COURT:  Well, let me ask you this.  What if this

1  all turns out -- and they're separate questions about the

2  ethical issues and all of that -- but wouldn't your client be

3  served if, in fact, Deutsche Bank or whomever is there is for

4  some reason is the right entity, wouldn't part of this be for

5  them to clean up the title and clean up all of this so that

6  your client has some assurance that this is the right entity to

7  whom they should be making payments?  Cleaning up title so

8  there's no problem with title later on and straighten all of

9  this out, wouldn't that be a part of that?  Doesn't that have

10  to be a part of that?  Otherwise, we haven't helped him, we

11  haven't done anything if, in fact, these are the right entities

12  or may be the right entities.

13         MR. KIM:  At minimum, what I've sought in similar

14  cases in other situations is an indemnification of my -- for my

15  clients.  The real issue is, if they're not the party to file

16  the proof of claim or not the party to foreclose, they may not

17  also be the party you can settle with, you know --

18         THE COURT:  So, you're saying if you had some sort of

19  indemnification for -- from somebody or something with some

20  substance behind it to give your client some comfort through

21  all of this that ultimately they won't be harmed or prejudiced

22  by whatever we do here?

23         MR. KIM:  Correct, Your Honor.

24         THE COURT:  That's part of it.

25         MR. KIM:  Yes.

1         THE COURT:  But, ultimately it does you no good if I

2  just expunge a claim without an adversary behind it.

3         MR. KIM:  Your Honor, as I said, I believe that the

4  expunging of the claim is sort of our first step based on what

5  we've seen so far.  That the next logical step is for -- based

6  on discussion with my clients to file proof -- to file

7  essentially an adversarial because, as I said, at this point we

8  have not seen anything come forward that demonstrates that they

9  have --

10        THE COURT:  I'm getting an uncomfortable feeling that

11  we don't have the totality of the problem before us, other than

12  perhaps the ethical issue of whether I think it was Mrs. Bee or

13  Ms. Bee (phonetic), whoever it was and her involvement through

14  all of this, but regarding the underlying claim, the underlying

15  lien, proper standing, Ms. Penpraze's issues, whether there's a

16  9011 potential out there, whether your adversary is out there

17  to deal with the underlying document itself, as opposed to just

18  a distribution for the trustee, it seems like we -- this hasn't

19  been teed up in its totality and I simply wonder what we need

20  to do at this point procedurally.

21        I may be able to deal with the ethical issues, but

22  everything other than that -- and there's so many other

23  questions like your indemnification question and ultimately

24  giving your client some peace of mind that they are dealing

25  with the right entity and if they're not they won't be held

17

1  accountable and somebody else will indemnify them for whatever,

2  attorneys' fees, costs, expenses, whatever that is.

3        Seemingly, that would be a part of a solution.  But,

4  I don't think we're there yet.  And it almost seems like if

5  there is a 9011 motion that should be brought or an adversarial

6  proceeding that should be brought, that seemingly should be

7  tied up in all of this otherwise we're going to be trying to

8  figure this out and then other related pleadings, motions,

9  adversaries are going to be filed and it seems like they should

10 be done all at the same time, I would think.

11       MS. PENPRAZE:  I don't --

12       THE COURT:  And either it gets resolved or it doesn't

13 get resolved or we end up some questions, some very concrete

14 questions, be it the ethical issues or whatever, just so that

15 we're not spinning our wheels because this could last forever

16 and a day, but I think there's a better way of handling this.

17 And we haven't heard -- Ms. Grigg, do you have a position on

18 what we've heard thus far?

19       MS. GRIGG:  Yes, Your Honor, I just wanted to make a

20 few points based on what's been said so far.  Really what it

21 comes down to at the end of the day, and Ms. Penpraze has

22 addressed her concern of me given that we now have the original

23 note in our possession that we received from BAC, that there

24 are additional endorsements on the original note.  We have

25 addressed this with our client.  My client has told my office

1  and myself that their procedure when they -- when the original

2  note was first received after the closing with Home Funding

3  Finders that it's immediately scanned into the client's

4  computerized system as part of -- to be made as a computerized

5  collateral file and at receipt it therefore would have only had

6  that original endorsement from Home Funding Finders.

7  Subsequently, after it's scanned in the additional endorsements

8  are placed on there.  However, as can be seen from the copy of

9  the original note that we filed on ECF yesterday, ultimately,

10 the note it still endorsed in blank and BAC has possession of

11 that note and being the holder of this note it is the entity

12 that has right to enforce its payments.

13         The prior affidavit submitted by my client spells out

14 the relationship between Countrywide and BAC.  So, we feel

15 we've met that burden to show that there's not -- you know,

16 we're not really going from one bank to the next that they all

17 fall under, you know, the same umbrella here.  So, in the end

18 BAC is a holder of this note and therefore has the right to

19 enforce it.

20         In terms of any sanctions motion that has been

21 mentioned there has to be a finding of bad faith and there is a

22 standard that has to be met.  And in this case there has been

23 no challenge to the numbers in the proof of claim to show that

24 they were incorrect.  It's strictly been a matter of standing.

25 And BAC as having possession of the note, you know, would have

1  filed this claim or would have, you know, referred the matter

2  to my office to file this claim on their behalf in good faith,

3  given that they are in possession, and under New York law the

4  holder of a note can enforce that note.  So, I don't think the

5  sanctions, you know, whether now or, you know, in the future

6  under a 9011 motion are appropriately -- are appropriate.

7        There's been a lot of talk about Bevins and there's

8  been a lot of talk about trust agreements and I, again, want to

9  just remind the Court that in my case -- my case is a much

10  simpler case because we're basically a one-stop shop here.  We

11  don't have a trust agreement.  There is not, you know, five

12  other entities potentially involved.  We have, you know, one

13  client here that is issued an affidavit.  The affidavit was

14  based on the client's review of the computerized -- what the

15  documents maintained in their computerized system which is the

16  note that was attached to the proof of claim.  So, it is

17  accurate because, you know, that note that the affidavit was

18  based off of is -- was an accurate copy when it was received,

19  initially, by Countrywide.

20        So, there's been no -- really there is no inaccuracy

21  in any of our prior pleadings, and as we put in our

22  supplemental papers that we filed with the Court, ultimately

23  the underlying transaction remains valid.  The debtor signed a

24  note and mortgage, he owes the money.  He's made payments to

25  Countrywide and, you know, now BAC for years so I think in the

1  end the debtor is going to have a very difficult time coming

2  forward and saying we're not the proper entity.

3         THE COURT:  Well, let me ask this, Mr. Kim, you

4  indicate you're considering filing an adversary proceeding to

5  challenge the underlying standard validity lien of the --

6  standard of the lien itself.  What would be your basis to

7  challenge?  You're saying this is an invalid mortgage, I think,

8  and that your client doesn't owe this, is that what you're

9  saying?

10        MR. KIM:  No, Your Honor.  It's all about the owner

11 of the note, who is entitled to enforce it, and I'm not certain

12 that it is, in fact, true that this -- there is no trust

13 involved in this.

14        THE COURT:  When you say no trust --

15        MR. KIM:  I think there's a --

16        THE COURT:  You mean bad faith?

17        MR. KIM:  No.  What I'm saying is that this is a

18 securitized note.  It has, I think, the same infirmities that

19 the Bevins has in terms of who owns it and whether or not it --

20 Your Honor, the tension here is that we have essentially -- we

21 have these large trusts, pooling of mortgages, that essentially

22 have certain requirements how they're transferred.  Those

23 requirements have to be met for tax reasons, and essentially

24 they -- our intention with how very often these were

25 transferred -- well, assigned, negotiated, by the entities that

21

1  basically originated it, deposited it into the trust,

2  et cetera.

3           So, I'm -- you know, I would I guess on the Szumowski

4  matter would differ that this -- there is no trust involved in

5  here.  This is still a securitized note.  There is then going

6  to be a PSA that rules how this is -- this note should have

7  been processed and transferred, and in that regard I do not

8  believe right now it's a public.  There's a different -- there

9  are some that were public, there are some that are private.

10 So, discovery will be required for us to get that PSA and

11 understand it.  So, basically I do believe that there's an

12 issue just as large in Szumowski as there is Bevins as to who

13 actually owns this note.

14          THE COURT:  Mr. Kraus, what's your position?

15          MR. KRAUS:  Thank you, Your Honor.

16          I would echo what Ms. Griggs said in terms of the

17 9011 motion.  But, I guess the bottom line, and I'll start from

18 there, Your Honor, is that I look forward to presenting on

19 behalf of my client in the Bevins matter the evidence and

20 explaining the evidence and dispelling the misinformation

21 that's out there because I wholeheartedly disagree with -- and

22 respectfully disagree with Mr. Kim and Ms. Penpraze in terms of

23 what they say the documents that have been produced say and how

24 they contradict themselves.

25          Ms. Penpraze was kind enough to provide the parties

22

1  yesterday with this chart that she referenced to Your Honor

2  which she believes highlights some of the inconsistencies

3  between the documents.  I did try to reach Ms. Penpraze this

4  morning because I had hoped to be able to discuss this with her

5  before we got on today's conference call because there is a lot

6  in that document that I disagree with and I think I could

7  easily educate Ms. Penpraze on.

8         And, you know, just taking as an example, Your Honor,

9  there was a, you know, it was noted that the note attached to

10 the proof of claim is hand-marked a redaction where the numbers

11 are and that was filed by predecessor counsel to me and then

12 there is an electronic redacting on the note that was attached

13 to the opposition papers that we originally filed on January

14 10th.

15        Now, that electronic redaction was done by my office,

16 for instance, and the reason it was -- it's different is

17 because we have the collateral file and I actually scanned the

18 collateral file and the original note that's in the collateral

19 file, and so we electronically redacted it.  So, that's why

20 there's a difference between the redacting marks.  It's not

21 that it's necessarily a different note, it's just that two

22 firms handled it differently.

23        So, there are many instances like that which I can

24 understand why at first blush it might raise some eyebrows, but

25 there is no great mystery to much of this, Your Honor.  And so

1  I think at this point if Your Honor is going to allow for

2  further discovery on the issues that have been raised by Ms.

3  Penpraze and Mr. Kim I'm happy to produce the witnesses and

4  produce the paper to support Deutsche Bank's ability to come

5  forward and so, we are the secured creditor and we have

6  standing.

7         THE COURT:  Well, it seems to me at this point that

8  this -- as I said earlier, I just don't know that this is teed

9  up and I think we need to do what we have to do to resolve,

10 number one, whether Ms. Penpraze thinks a 9011 motion needs to

11 be brought, and if so then that needs to be joined in because

12 all of these pieces may well fit together.  And I think Mr. Kim

13 should have whatever opportunity to join in with that,

14 especially regarding the trail of endorsements.  And maybe

15 you're right, maybe there's an easy answer to all of this, but

16 from this point now it -- that seems optimistic, maybe you're

17 right.  But, I guess I need to know from the parties what is

18 the best way to proceed at this point realizing that if there

19 are other proceedings that are going to brought at some point I

20 think it all needs to be teed up so we deal with this as a

21 package because the package may answer the question in

22 totality.

23        COURT CLERK:  I mean, you've given even the motion

24 before the Court it doesn't sound like the parties agree on the

25 facts, so I'm thinking we need an evidentiary hearing on the

1  (indiscernible) order --

2          THE COURT:  And we may well need once the parties get

3  to that point.  Once you -- if you do your discovery and Ms.

4  Penpraze either looks at the note or gets the further

5  explanation from counsel as to what the disputed facts are, I

6  don't know that we know at this point what the disputed facts

7  are, once you've all had a chance to discuss it with one

8  another, do whatever discovery.  I simply want to know at this

9  point what would be appropriate with my docket?  What do we

10 need to do realizing, ultimately, if somebody wants to bring

11 something else that is related to this problem, I think it

12 should all be done together so the Court can decide with some

13 totality the whole problem.

14         COURT CLERK:  Do we need to do like a scheduling

15 order on this --

16         THE COURT:  Well, I don't know --

17         COURT CLERK:  -- because we didn't do discovery.

18         THE COURT:  Yes, I don't know if we're there yet or

19 if the parties want to discuss this or examine whatever

20 informally or -- Ms. Penpraze?

21         MS. PENPRAZE:  I think we need to have some

22 parameters for discovery because I appreciate Mr. Kraus'

23 comment and I would, you know, be glad to make our discovery

24 demand -- document demands, review the documents and then do

25 some depositions because I don't feel comfortable right now

1  making a 9011 motion without all the information.  So, I think

2  we are where we are.  I think we could probably all recognize

3  that there are going to have to be additional pleadings, but I

4  don't think we have the proper information right now to do

5  that.

6       THE COURT:  So, do we need a scheduling order?  Do

7  the parties want to discuss this informally and adjourn this

8  out for however period of time?  I need some direction from

9  what the parties need.

10      MR. KIM:  And I guess for me, Your Honor, it's sort

11 of a question.  Beyond the obvious document production and what

12 I believe would be a couple of depositions of individuals in

13 both of these cases, I believe that the critical issue is going

14 to be understanding when exactly these endorsements were made.

15      In other words, let's take Bevins, for instance, we

16 know that it is -- a trust is involved.  We also know that that

17 trust basically closed in December of 2006.  There are issues

18 relating to how, you know, essentially whether or not a note

19 can come and go after that date.  There are ways of basically

20 date stamping, essentially determining by ink analysis,

21 forensic analysis, when those endorsements were, in fact, made,

22 but access to the originals would be required.  And so, I

23 guess, my question for you is, I don't know if that's something

24 that would be appropriate in just -- in the current stage even

25 with an -- you know, a scheduling order or I would basically be

26

1  forced to do an adversarial to do that, because basically

2  that's what we'll be looking for beyond depositions is we

3  believe that definitely in Bevins and perhaps in Szumowski we

4  need to understand when those endorsements were made.   There

5  are experts out there that can do non-destructive testing of

6  the ink to determine that it was -- that stamp or that

7  signature was done last week or it was done four years ago.

8          THE COURT:  So, we go down a CSI road.

9          MR. KIM:  Exactly, Your Honor.

10         MS. GRIGG:  Your Honor, if I may, Natalie Grigg.

11         I believe in my, you know, two cents on this is, you

12 know, we need -- I understand the need for document discovery

13 as well as, you know, depositions, but to comment on Ms. Kim's

14 potential forensic testing, obviously we would bring that to my

15 client, but I'm guessing we're probably going to object to

16 that, first on the grounds that this is a bearer instrument and

17 we cannot let these instruments out of our possession and

18 control, I mean, for obvious reasons that the Court is aware

19 of.

20         Whoever bears an instrument endorsed and blank is its

21 holder who is entitled to enforce it, whether it's an

22 individual or another entity.   We can't just be handing these

23 notes out to whatever.   If there is any way that this note gets

24 destroyed or lost, that in it of itself is going to raise a

25 whole other slew of issues that, you know, I don't think any of

27

1  the parties want on their hands per se.

2        THE COURT:  So, Mr. Kim's CSI expert will do it under

3  supervision, or whatever it is.  I'm sure that can be arranged.

4  I'm not --

5        MR. KRAUS:  Your Honor --

6        THE COURT:  I'm not going to have some unknown expert

7  purloin the note and then go out and try and sell it on the

8  secondary market or something.  I mean, there's a way of doing

9  all of this, and I'm sure all of you can get together.  This

10 isn't unique stuff.  You can all get together and figure this

11 out.  But, there are questions of fact, and I don't know that

12 that's out of line for Mr. Kim to want to make sure to know the

13 dates of what was done when.  I don't know the significance of

14 that, if any, but it certainly doesn't seem like that should be

15 that big an issue if it's done under supervision and if it

16 doesn't affect the underlying piece of paper.

17       MR. KRAUS:  Your Honor, Schuyler Kraus.  If I may

18 just weigh in on this issue.

19       I am happy to work with all the parties to figure out

20 a consent scheduling order, a discovery order.  I'm happy to do

21 that and I'm sure we can do that.  But, obviously, there are

22 now -- I can see there are going to be issues as to the scope

23 of that discovery.

24       In terms of a forensic analysis on the ink, I mean,

25 there is evidence, for instance, in Bevins where we have a

1   custodial receipt saying -- which is evidence -- showing that

2   the custodian had as of whatever date in December 2006,

3   possession of the original note and mortgage, and I would

4   understand why Mr. Kim would want to depose that witness and

5   talk to that witness and find out how that can be confirmed and

6   to test that evidence.

7            However, whether or not the note was endorsed and

8   stamped on December 21st or on December -- or on January 1st,

9   2007, after the closing date of the trust according to the PSA,

10  which it wasn't, but just as a hypothetical is really, I would

11  submit, irrelevant to the issue.  That would be a contract

12  dispute between the parties to the PSA.  If there was some tax

13  implication or if there was some reason why this endorsed note

14  -- because in my case it is endorsed through the trust --

15  doesn't fall into that trust and so they have lost some of the

16  protections or the benefits of it being in that trust that's

17  for the parties to the PSA to dispute amongst themselves.

18           There would be no reason why Mr. Kim would be able to

19  use that as a reason why we don't own it, Deutsche Bank,

20  because it's endorsed to them and it's held -- you know, their

21  agent is holding it for them or why they are not a secured

22  creditor.

23           THE COURT:  Well, counsel, that's -- those are issues

24  that fortunately we don't have to cross today.  We're just

25  trying to figure out the scope of the problem and I think to

29

1  begin there's really nothing I can rule upon today.  I have the

2  feeling that more pleadings are going to come in.  And,

3  frankly, the first question I have, is there going to be a 9011

4  motion, is there going to be an adversary filed?  And, if so, I

5  want that involved in the whole process so that I'm not doing

6  this piecemeal.  And along with those questions all of you are

7  going to have to get a certain level of comfort with where you

8  are, what you need to do, if anything.

9       Maybe after all of you talk and exchange whatever

10 you're going to exchange maybe the positions become clear,

11 maybe they become murkier, I don't know, but that's -- we have

12 to figure out what is appropriate at this point regarding --

13 Mr. Kim's motion is before me, there's not much I can do with

14 it today until it's refined and what do we do to refine it.  Do

15 you want me to do a scheduling order?  Do the parties want me

16 to adjourn this a week and all of you can talk about it to see

17 if you can come to some common ground on what needs to be done?

18      If not, ultimately, there maybe issues for this Court

19 to decide.  Maybe Mr. Kim wants a CSI investigation and maybe

20 you oppose it saying it's whatever, not relevant or -- and all

21 of that can be teed up at the appropriate time, but right now I

22 think we need some ground rules as to how we're going to

23 proceed.

24      MR. KRAUS:  Well, I'm happy to work with the parties

25 and submit to Your Honor a discovery schedule on consent if

30

1  that's --

2          MR. KIM:  That would be fine with me, Your Honor.

3          MS. GRIGG:  That would be fine with me, as well.

4          THE COURT:  Then let me just ask this.  Do we outside

5  -- do I do some sort of scheduling order?  Do we just have the

6  parties agree on this and you're going to submit me some sort

7  of order on consent within the confines of what's already

8  before me, or what procedurally -- what paperwork and road do

9  we follow?

10         COURT CLERK:  Judge, we can do a scheduling order

11  with a discovery and --

12         THE COURT:  Only --

13         COURT CLERK:  -- a pretrial conference and then we

14  can come back at some point.

15         THE COURT:  Do the -- what if I do that just so that

16  we have something to start with and that can always be

17  modified?

18         MR. KRAUS:  I didn't hear the suggestion, Judge.

19         THE COURT:  That I do a -- that in effect I do a

20  scheduling order on Mr. Kim's motion and just plug in a

21  discovery date and a pretrial just so that there's a parameter,

22  and then the parties can discuss it and see if you can agree

23  with your own ground rules and if not we can come back and you

24  can put before me whatever you can put before me.  I think this

25  is pretty simple at this point.

31

1      MR. KRAUS:  I'm fine with that, Your Honor.

2      THE COURT:  What --

3      MS. GRIGG:  I'm fine with that, as well.

4      THE COURT:  The only question would be, what's the

5  initial date that I put in there for discovery?

6      COURT CLERK:  Judge, that can be further extended, as

7  well as the pretrial adjournment.

8      THE COURT:  It can be further extended, but do you

9  want me to put in a day, a week, a month, two months?  Give me

10  some parameter as to what you want at the outset and then I

11  will leave it all in your good hands.

12      MR. KRAUS:  Well, Judge, anticipating that there are

13  going to be depositions in this as part of the discovery

14  process, I would ask for a date in late April.

15      THE COURT:  Counselors, is that all --

16      MR. KIM:  No objection here, Your Honor.

17      THE COURT:  So, what --

18      COURT CLERK:  Judge, the 29th is the last day of

19  April.

20      THE COURT:  So, what if I plug in for today the last

21  business day in April which is Friday the 29th and set a

22  pretrial earlier that week to see what's happening with

23  discovery, whether it needs to be further extended?  Maybe by

24  that time Ms. Penpraze will know whether she believes a 9011

25  motion is appropriate or not, maybe by then Mr. Kim will know

1  whether he thinks a further contested matter or adversary needs

2  to be filed and maybe that will somehow re-frame the scheduling

3  order.  It could go a myriad of ways, but initially if we can

4  all agree that April 29th sounds good with a pretrial, Ms.

5  O'Connell, perhaps earlier that week.

6              COURT CLERK:  We could do either the 25th or the 26th

7  which is the Monday and a Tuesday.

8              THE COURT:  What if I put this telephonically on for

9  a pretrial on the 25th so you can update me on discovery and

10 whether we need to further extend it, close it, whatever

11 tinkering we need to do.

12             MR. KRAUS:  That's fine for me, Your Honor.

13             MS. GRIGG:  That's fine for me, as well, Your Honor.

14             THE COURT:  Ms. O'Connell, give us a time.

15             COURT CLERK:  Is ten o'clock --

16             THE COURT:  Does 10 a.m. work for all of you if I --

17 if we put you all on the phone from what you can tell?

18             MR. KRAUS:  Works for me, Your Honor.

19             MS. GRIGG:  Works for me.

20             COURT CLERK:  And --

21             THE COURT:  Ms. Penpraze?

22             MS. PENPRAZE:  That's fine, Your Honor.

23             THE COURT:  Mr. Kim?

24             MR. KIM:  Yes.

25             THE COURT:  Ms. Baker?

33

1        MS. BAKER:  Yes, Your Honor.

2        COURT CLERK:  Judge, do you want everyone who's here

3   on the phone?

4        THE COURT:  Well, let me just ask.

5        COURT CLERK:  Or do we want to just --

6        THE COURT:  I certainly want Ms. Penpraze, Mr. Kim

7   and the other two attorneys.  Does the Chapter 13 Trustee want

8   to be a party to this?

9        MS. BAKER:  Yes, please.

10        THE COURT:  So, we're going to have --

11        COURT CLERK:  We'd have five parties on the phone,

12   which would require an AT&T conference.

13        THE COURT:  Well, can I --

14        MS. PENPRAZE:  I could come down.

15        THE COURT:  I was going to say can --

16        MS. PENPRAZE:  I'm only a block away.

17        MS. BAKER:  I can see that both of us are here.

18        THE COURT:  So, why don't we have --

19        COURT CLERK:  So, you want these two here and the

20   other three by phone.

21        THE COURT:  -- Ms. Baker and Ms. Penpraze come down.

22        COURT CLERK:  Okay.

23        THE COURT:  And we'll put the other three attorneys

24   on the phone just so that we can figure out where we are.

25        MR. KRAUS:  Your Honor?

34

1        THE COURT:  Yes.

2        MR. KRAUS:  It's Schuyler Kraus.  I'm happy to

3    circulate a call-in conference number if that's -- if that

4    would be helpful.

5        THE COURT:  No, it actually works better when we can

6    set the -- when we can make the phone call and all, and if we

7    get too many then we have to get AT&T involved and that just --

8    it's just not as flexible.

9        COURT CLERK:  Okay.  So, Mr. --

10       THE COURT:  So, if Ms. Penpraze and Ms. Baker can

11   come down we can handle the other three.

12       COURT CLERK:  The other three can be by phone and

13   that will be April 25th at 10 a.m.  Discovery will end April

14   29th and the Court will do a scheduling order, one in each of

15   these cases.

16       THE COURT:  Correct.

17       COURT CLERK:  And then at the date -- the 25th we can

18   always extend that or add more dispositive motion and other

19   dates if needed.

20       THE COURT:  And then, counselors, the only other

21   thing I would advise if between now and the end of April other

22   issues come up, problems, simply call my courtroom deputy and

23   we can get you all on the phone prior to then, but I would

24   assume this is just going to take a somewhat routine course to

25   try and wade through this to see what issues are there, what

1  issues you can resolve and where we may be ultimately going

2  with other proceedings filed in conjunction with Mr. Kim's

3  official motion.

4        MR. KIM:  Well, Your Honor, I presume based on the

5  comments we are going -- I'm going to be coming back on the

6  forensic testing issue to you fairly soon if we've got an April

7  29th deadline, so.

8        THE COURT:  Well, and that's fine, but if we're going

9  to get creative I would simply ask the parties to go far enough

10  so that you can give me some basis, Mr. Kim, why it's relevant

11  and on the other side why it isn't.

12        MR. KIM:  Yes, Your Honor.

13        THE COURT:  I don't want -- I just don't want to tee

14  these up so that they're premature so that there aren't some

15  hard reasons why we're going forward and hard reasons why we're

16  resisting.

17        MR. KIM:  And, Your Honor, I think it's relevant to

18  both issues.  It's relevant to the issue of who -- the standing

19  issue.  It's also relevant to the 9011 issue relating to how

20  these documents are being produced.  As I said at an original

21  hearing, you know, the note that was now being presented is a

22  completely different note and then there'll be affidavits to

23  sort of say this is all great, and that I think forensic

24  testing relates to that issue.

25        THE COURT:  The only thing I would suggest, Mr. Kim,

36

1  if you feel that to be a necessity, that's fine, but I think

2  you would need to address Ms. Grigg's concerns as to --

3                  MR. KIM:  Yes, Your Honor.

4                  THE COURT:  -- who does this, how do they do it,

5  where do they do it, those kind of details so that any concerns

6  that Ms. Grigg brought up today could be adequately addressed,

7  and we're not talking about housekeeping problems.  It's the

8  substance, is it relevant, is it necessary, those that go to

9  the heart of the issue.

10                 MR. KIM:  Sure, Your Honor.

11                 THE COURT:  Okay.  Counselors, what else do we need

12 to do today, if anything?

13                      (No audible response)

14                 THE COURT:  Ms. Grigg?  Mr. Kraus?

15                 MR. KRAUS:  I have nothing, Your Honor.

16                 MS. GRIGG:  I have nothing else, Your Honor.

17                 THE COURT:  Ms. Penpraze?

18                 MS. PENPRAZE:  Thank you, Your Honor.

19                 THE COURT:  Ms. Baker.  Mr. Kim.

20                 MR. KIM:  All set, Your Honor.

21                 THE COURT:  Counselor, all of you have a good day.

22                 Any questions give my courtroom deputy a call.

23                      *  *  *  *  *

24

25

# C E R T I F I C A T I O N

I, COLETTE MEHESKI, court approved transcriber,
certify that the foregoing is a correct transcript to the best
of my ability from the official electronic sound recording of
the proceedings in the above-entitled matter, and to the best
of my ability.

*Colette Meheski* cr

COLETTE MEHESKI

J&J COURT TRANSCRIBERS, INC.          DATE:   February 22, 2011